NORMAN D. STUCKEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; NORMAN D. STUCKEY AND FRANCES A. STUCKEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stuckey v. Commissioner
Docket Nos. 3170-79, 3171-79.
United States Tax Court
T.C. Memo 1982-537; 1982 Tax Ct. Memo LEXIS 209; 44 T.C.M. (CCH) 1148; T.C.M. (RIA) 82537; September 20, 1982. Ken C. Kotecha, for the petitioners. Genevieve K. Murtaugh, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax, as well as additions to tax under section 6653(b), [1] as follows: Taxable
Year
Deficiency
Addition to Tax
1973
$4,530.46
$2,265.23
1974
11,617.60
5,808.80
The Commissioner also determined a deficiency in the Federal income tax of the petitioner Norman D. Stuckey for the taxable year 1975 in the amount of $5,552.96. After concessions, the following issues remain for decision: (1) whether the statutory notice of deficiency for the taxable years 1973 and 1974 was timely mailed; (2) whether petitioners are entitled to a deduction for automobile expenses in any amount *212 greater than that allowed by the Commissioner; (3) whether petitioner may deduct the expenses of their horse farm, and, if so, the amount of those expenses; (4) whether petitioners have fully substantiated deductions claimed for real estate taxes and interest; (5) whether and in what amount petitioners must recognize gain on the sale of a beer wagon in 1973; (6) whether and in what amount petitioners must recognize gain on the sale of various antiques in 1974; (7) whether petitioners must recognize gain on the sale of real estate in 1974; (8) whether any part of any underpayment of tax for petitioners' taxable years 1973 and 1974 was due to fraud; and (9) whether our denial of petitioners' request to inspect the memoranda in respondent's files constituted the denial of petitioners' right to due process of law. Some of the facts in these cases have been stipulated. The stipulations of fact and stipulated exhibits are incorporated herein by this reference. The petitioners are husband and wife. At the time they filed their petitions in these cases they resided in Dayton, Ohio. Petitioners filed joint Federal income tax returns for their taxable years 1973 and 1974 with the Cincinnati *213 Service Center. Petitioner Norman D. Stuckey filed a separate Federal income tax return for the taxable year 1975 with the Cincinnati Service Center. Most of the issues herein primarily concern the affairs of the petitioner Norman D. Stuckey, and all references to "petitioner" in the singular refer to him. Issue 1. Statute of Limitations
We must first determine whether the statutory notice of deficiency for the taxable years 1973 and 1974 was timely mailed. There is no question of the timeliness of the mailing of the statutory notice of deficiency covering the taxable year 1975. Petitioners filed their joint Federal income tax return for 1973 on April 15, 1974. On March 3, 1977, while their return for 1973 was being audited, petitioners and the Commissioner executed an agreement by which they consented to an extension of the period of limitations for assessment for their taxable year 1973 to December 31, 1978. Before signing the agreement petitioners asked an agent of the Internal Revenue Service for advice in the matter. The agent advised them that it would be in their best interest to execute the agreement, but he did not put any pressure on them to do so, and *214 he reminded them that the decision was theirs. The record does not disclose when petitioners' joint Federal income tax return for 1974 was filed. Petitioners' signatures on the return are dated April 13, 1975, however, and the return was apparently filed at about that time. The amount of gross income [2] stated in the return was $51,560.40. As discussed in more detail below, petitioners omitted from gross income a gain in the amount of $17,500 which they realized on the sale of land. The statutory notice containing the Commissioner's determination that petitioners were liable for deficiencies and additions to tax for their taxable years 1973 and 1974 was issued on December 11, 1978. There is generally a three-year period of limitations on assessment and collection of income taxes. Sec. 6501(a). The period of limitations commences running when the return is filed. Returns filed before the last day prescribed for filing are deemed filed on *215 such last day. Sec. 6501(b)(1). The period of limitations may be extended by agreement between the Secretary and the taxpayer. Sec. 6501(c)(4). Petitioners argue that the statutory notice with respect to their taxable years 1973 and 1974 was not timely, since it was not mailed within three years of the dates on which their returns for those years were actually or constructively filed. With respect to 1973, respondent argues that, although the notice of deficiency was mailed more than three years after the period of limitations commenced running, the statutory notice was still timely mailed because it was mailed within the period of limitations as extended by agreement between petitioners and him. Petitioners do not contest the timeliness of the mailing of the statutory notice if the agreement is held valid; they argue, however, that the agreement is invalid, because it was executed under dures. We do not agree with petitioners. While we can easily imagine that the audit of petitioners' tax returns was a nerve-racking experience for them, nothing in the record indicates that respondent's agents attempted to take advantage of the stress that they were feeling by harassing *216 them into a hurried or ill-considered decision to execute the agreement. The advice of respondent's agent that the execution of the agreement was in petitioners' best interest was not forced upon petitioners, but was offered in response to their inquiry. Furthermore, it was not unreasonable in the circumstances. There may, indeed, be substantial benefits in consenting to an extension of the period of limitations. For example, the extra time may make it possible for the parties to resolve their disputes by settlement, making the issuance of a statutory notice of deficiency unnecessary. We conclude that petitioners' agreement was not executed under duress and hold that the statutory notice of deficiency for petitioners' taxable year 1973 was timely mailed. [3]
Petitioners also contend that the statutory notice of deficiency as to their taxable year 1974 was not timely mailed, but this is clearly not the case. Although the period of limitations on assessment is generally three years, it is extended to six years *217 if the taxpayer omits from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return. Sec. 6501(e)(1)(A). As noted above, petitioners omitted a gain of $17,500 from their return. [4] This is more than 25 percent of the $51,560.40 of gross income included in the return. Consequently, the applicable period of limitations with respect to petitioners taxable year 1974 was six years. This period began running no sooner than April 15, 1975. It follows that the mailing of the statutory notice of deficiency with respect to 1974 was timely. *218 Issue 2. Automobile Expenses
During each of the years in question, petitioner was in the business of publishing an apartment directory. In the pursuit of this business, petitioner was required to travel a great deal by car "for purposes of establishing necessary contacts, obtaining the required information, agreeing upon the terms and number of publications, and, most importantly, distributing the directories." Most of petitioner's travel was between dayton, where he lived, and Cincinnati, with side trips to other towns in the Cincinnati area. Petitioner apparently always returned to his home in Dayton to spend the night. Petitioner owned two cars, a Maverick and an El Camino, which he used exclusively in the apartment directory business. Petitioners also owned a Cadillac and a Volkswagen for their personal use. Petitioner computed his deductions for automobile expenses for all of the years in question by using the standard mileage rate and claiming the total miles driven in the Maverick and El Camino as business miles. The Commissioner disallowed the deductions claimed by petitioners, but allowed deductions based on lower mileage figures. The mileage amounts claimed *219 by petitioner and allowed by the Commissioner are as follows: Taxable
Miles Claimed
Miles Allowed by
Year
by Petitioner
the Commissioner
1973
45,397
33,397
1974
29,855
17,855
1975
21,928
9,928
The records produced by petitioner did not support the amounts of business miles claimed in his tax returns. We are convinced, however, that he drove more business miles than respondent has allowed. Using our best judgment on the basis of the record before us, we hold that petitioner is entitled to deductions for automobile expenses based on the following amounts of business miles driven: [5]
Taxable Year
Business Miles
1973
37,500
1974
22,500
1975
12,500
Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930).
*220 Issue 3. Deductibility of Farm Expenses
The parties are in dispute as to the deductibility of the expenses of a farm owned by petitioners and located in Ohio (hereinafter referred to as the Ohio farm or the horse farm). This issue may be broken down into three sub-issues: (a) whether the Ohio farm and a second farm owned by petitioners and located in Iowa (hereinafter referred to as the Iowa farm) constituted a single, integrated activity, or two separate activities; (b) whether the Ohio farm was an activity engaged in for profit within the meaning of section 183; and (c) whether the claimed expenses of the Ohio farm have been substantiated. (a) Scope of the Relevant Activity
As indicated above, petitioner owned two properties on which he conducted agricultural activities: the Iowa farm and the Ohio farm. The Iowa farm consisted of 175 acres, on which petitioner grew corn and beans. The Ohio farm consisted of 15.2 acres, on which petitioner bred and raised draft horses and carried on small-scale poultry operations. There was little relationship or interdependence between the operations conducted on the two properties, although, as petitioner testified there were *221 occasions when I would buy supplies [in Ohio] and on our many trips to Iowa we'd just take whatever needed along. Now, I don't mean a load of cement or something like that, but special things were taken back there on the trailer. Wood, and paint supplies, and things like that. In keeping his books and records and preparing his Federal income tax returns for the years in question, petitioner treated the enterprises carried on at the two locations as a single business; the combined results of the Iowa and Ohio farms were reported on single Schedules F, Farm Income and Expenses, on which petitioner reported net losses for the years in question as follows: Year
Loss
1973
($6,330.28)
1974
($ 709.98)
1975
($2,330.93)
During the years in question, the Iowa farm generally operated at a profit while the Ohio farm operated at a loss. If the results of the operations of the Ohio farm had been reported separately, the following losses would have been reported: Year
Loss
1973
($6,061.56)
1974
($6,232.35)
1975
($5,927.22)
Respondent determined that the Iowa and Ohio farms were separate activities, and that the Ohio farm was an activity not *222 engaged in for profit within the meaning of section 183. [6] Respondent also determined that the claimed expenses of the Ohio farm had not been adequately substantiated. Petitioner argues that the two farms constituted a single, integrated activity which was engaged in for profit. Petitioner argues alternatively that, even if the two farms constituted separate activities, the Ohio farm was still an activity engaged in for profit. We will first determine whether the Iowa and Ohio farms constituted a single activity or two separate activities. Respondent's regulations provide as follows: where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all of the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic *223 interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. [Sec. 1.183-1(d)(1), Income Tax Regs.] We believe that a consideration of the facts of these cases in light of these criteria leads to the conclusion that the Iowa and Ohio farms were separate activities. We consider the "organizational and economic interrelationship" of the two enterprises to be very slight, consisting entirely of the transfer of some few supplies back and forth between the two farms and their treatment as one enterprise for bookkeeping purposes. There has been no showing of any reciprocal benefit derived from the simultaneous operation *224 of the two farms such as would indicate that they were one integrated activity rather than two separate ones. Furthermore, the growing of crops and the breeding of horses are dissimilar undertakings, although both may be broadly described as agricultural. Accordingly, we conclude that the two farms constituted separate activities and we will decide the question of whether the Ohio farm was an activity engaged in for profit on that basis rather than by considering the two farms together. Compare Davis v. Commissioner,29 T.C. 878 (1958). (b) Section 183
As noted above, petitioner bred and raised draft horses on his Ohio farm. Petitioner grew up on his family's farm in Iowa, and draft horses were kept on that farm. He bought the first horse for his Ohio farm in 1966 or 1967, but he did not begin raising horses as a business at that time. The record does not reveal the year of the alleged start of the business or the amount of the horse farm's profit or loss for any year before or after the years in question. Petitioner testified that he "filed for every year and some years showed them as a profit," but it is unclear whether petitioner meant that he had *225 shown a profit on his horse farm specifically, or on the combined operation of the Iowa and Ohio farms. Petitioner described his horse breeding operation in the following general terms: I try to conduct it in a professional way so that by buying large stallions so you have large colts. I avail myself to the services of two good veterinarians. I feed the horses properly based on recommendations by various universities and breeders as to what you should do or keep them inoculated, vaccinated. The breeding record of the horses are kept. The mares that are brought in for breeding are professionally handled and taken care of. Petitioner described the work that he performed personally as follows: Well, you feed the horses, you clean up the manure, you keep them clean, you train them, you work with them, you take care of them when they're sick, you look after the breeding of them, you manage the foals and all that. The work which was not done by petitioners personally was done by local teenagers whom petitioner hired for the purpose. Petitioner advertised the availability of his horses for breeding and for sale in various trade publications. Petitioner also showed his *226 horses at county and state fairs and drove them in parades as a means of advertising them. Furthermore, petitioner attended conventions and horse shows for the purpose of keeping up to date on the state of the market for draft horses and the latest methods of breeding and raising them. Petitioner's horse breeding operation has been beset by what he describes as a "series of misfortunes." Several horses died prematurely, including colts, mares, and at least one stud. Not all of these deaths occurred during the years in question, however. Despite his hard luck and record of losses, petitioner continued to breed and raise horses because "I hope to make it big someday * * * most people feel I have a few of the top mares in the United States, and I feel that I can, if I persist, * * * do well with them." As noted above, the Commissioner determined that petitioner's horse farm was not an activity engaged in for profit and, accordingly, that the expenses associated therewith were not deductible. Section 183(a) provides generally that, except as otherwise provided for in that section, *227 individual taxpayers will not be allowed deductions which are attributable to activities that are "not engaged in for profit." Guidance as to the meaning of the phrase "engaged in for profit" is found in section 1.183-2(a), Income Tax Regs., which provides: The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. Thus it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent. The issue is one of fact *228 to be resolved not on the basis of any one factor but on the basis of all the facts and circumstances. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Allen v. Commissioner,72 T.C. 28, 34 (1979). The regulations provide a list of the following criteria which "should normally be taken into account" in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.
Considering the present cases in the light of the applicable regulations, we conclude that petitioner's horse farm was an activity *229 engaged in for profit during the years in question. Petitioner carried on his horse breeding operation in a workmanlike fashion, guided by the practical experience he had gained during his youth on a farm on which draft horses were kept and by the information he obtained by attending conventions and horse shows. Petitioner and his hired helpers also expended substantial time and effort performing the chores associated with caring for the horses. While some of the objective criteria listed in the regulations weigh against petitioner, we do not consider them significant enough to offset the criteria which weigh in his favor. Thus, although petitioner's horse breeding operation incurred losses for each of the years in question, they were apparently the early years of the operation, and the losses were to some extent caused by the premature deaths of some of petitioner's horses. Consequently, we do not believe that, during the period in question, the normal operations of the horse farm compiled a record of losses so serious as to indicate that petitioner's ultimate goal was not to achieve a profit. It may also be true, as respondent alleges, that there were some elements of recreation *230 and personal pleasure in petitioner's horse breeding operation. The parts of the operation that can be so characterized, however, such as showing the horses at fairs and driving them in parades, were also a means of advertising the business, and they were much less significant in terms of hours spent than was the manual labor involved in caring for the horses, cleaning out the stalls and so on. In any event, respondent's regulations provide that: An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph. [Sec. 1.183-2(b)(9), Income Tax Regs.] In summary, we believe that petitioner operated his horse farm during the years in question, not for recreation or as a hobby, but with an actual and honest profit objective. (c) Substantiation of Expenses
Because we *231 have decided that petitioner's horse farm was an activity engaged in for profit, we must also decide what amounts of expenses petitioner has substantiated in connection with that activity. As noted above, petitioner reported the results of the combined operations of his Iowa and Ohio farms on a single schedule. For the years in question the following amounts of combined expenses were reported: 1973
1974
1975
Cash expenditures [7]
$7,725.29
$ 9,228.76
$ 9,707.69
Depreciation
1,323.10
1,116.60
1,066.60
Total
$9,048.39
$10,345.36
$10,774.29
If the Ohio farm had been treated as a separate enterprise, the following expenses would have been reported for it: 1973
1974
1975
Cash expenditures
$5,951.21
$6,029.65
$7,264.51
Depreciation
957.70
751.20
701.20
Total
$6,908.91
$6,780.85
$7,965.71
Respondent concedes that petitioner made cash expenditures specifically related to the Ohio farm in the following amounts: 1973
1974
1975
Feed, including corn
$1,159.49
$ 458.51
$1,146.41
and oats
Hay
508.85
590.50
941.87
Labor
383.90
1,545.35
991.25
Veterinary
16.00
12.00
124.64
Miscellaneous (horse
related)
49.50
244.41
209.28
TOTAL
$2,117.74
$2,850.77
$3,413.45
*232 Respondent has determined, however, that petitioner has failed to substantiate cash expenditures in any greater amounts. Respondent makes no concession with regard to the amount of allowable depreciation expense in connection with the Ohio farm. In an attempt to substantiate the claimed expenses of the Ohio farm, petitioner introduced many checks and invoices into evidence. It is unclear, however, how many of the checks and invoices represent expenses of the Ohio farm, and how many represent expenses of the Iowa farm. Furthermore, respondent argues that some expenses are duplicated in the checks and invoices submitted by petitioner and that some of the checks and invoices represent capital expenditures rather than currently deductible expenses. We agree with respondent and hold that petitioner is entitled to deductions for cash expenditures only in the amounts conceded by respondent. We also hold, based upon the entire record, that petitioner is entitled to deductions for the expense of depreciation of property used in connection with his Ohio farm in the amount of $250 for each of the years in question. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). *233 Issue 4. Substantiation of Taxes and Interest
The Commissioner partially disallowed deductions claimed by petitioner for each of the years in question for the deductions of real estate taxes and interest associated with his Ohio farm. [8] The amounts disallowed by respondent were as follows: Year
Item
Amount Disallowed
1973
Taxes
$408.42
Interest
32.43
1974
Taxes
342.84
Interest
85.35
1975
Taxes
450.06
Respondent's partial disallowances were based on his conclusion that petitioner had failed to substantiate the full amounts claimed. [9] Petitioner has introduced no evidence tending to substantiate deductions in any amount greater than respondent has allowed. Accordingly, we sustain respondent's determination on this issue. *234 Issue 5. Sale of Beer Wagon
Petitioner is a collector of antique wagons and carriages. In 1973, petitioner sold a beer wagon for $8,000. The sale was not reported in petitioner's Federal income tax return. Petitioner had purchased the wagon for $200 [10] and had had it refurbished by various workmen. Petitioner introduced checks totaling $605 into evidence representing payments for work done on the wagon. Petitioner also made some cash payments for work done on the wagon, but petitioner has no receipts or other record of these payments. In the notice of deficiency for 1973, the Commissioner determined that petitioner had realized a long-term capital gain on the sale of the wagon in the amount of $8,000, the total proceeds of the sale. Petitioner does not deny that he made the sale in question. He contends, however, that his basis in the wagon was at least equal to the sale proceeds and, consequently, that he realized no gain on the sale. Although we do not believe that petitioner has established that he had a basis of $8,000 in the wagon, we are convinced that he had some basis in it which offset *235 the sale proceeds to some extent. Using our best judgment on the basis of the record before us, we conclude that his basis in the wagon was $2,000 and, consequently, that he realized a long-term capital gain of $6,000 on the sale. Cohan,supra.
Issue 6. Auction of Antiques
On or about June 28 or 29, 1974, petitioner sold between 50 and 75 antique carriages and wagons at an auction held in Dover, New Hampshire. Petitioner received $22,603 from the auction. The auction was not reported in petitioner's Federal income tax return. The items sold were acquired by petitioner over a period of approximately thirty years. Since most of the items were purchased from strangers, petitioner almost invariably paid for them in cash. Petitioner refurbished the wagons himself, paying cash for parts and materials. As with regard to the sale of the beer wagon discussed above, petitioner argues that his total basis in the items sold was at least equal to the sale proceeds and that, consequently, he realized no taxable gain. In the notice of deficiency, respondent determined that petitioner had realized a long-term capital gain on the sale of the antiques in the amount of $22,603, *236 the total proceeds of the sale. Petitioner has failed to substantiate his claim that his basis in the items sold was equal to the sale proceeds, and respondent argues that petitioner has failed to produce even sufficient evidence for the Court to estimate his basis under the rule of the Cohan case cited above. We disagree with respondent. We are convinced, based upon the entire record, that petitioner had some basis in the items sold. Using our best judgment, we conclude that his basis in those items was $5,000, and, consequently, that he realized a long-term capital gain of $17,603 on their sale. Cohan,supra.
Issue 7. Sale of Real Estate
In 1957 and 1958 petitioners acquired two adjacent tracts of land located in Dover, New Hampshire, for a total cost of $2,500. Petitioners sold a portion of the land in 1958 for $500. On or about October 30, 1974, petitioners sold the remainder of the land for $20,000. Petitioners did not report this sale in their joint Federal income tax return for 1974. In the notice of deficiency for 1974, the Commissioner determined that petitioners had realized a long-term capital gain on the sale of the land in the amount of $17,500. *237 In making this determination, the Commissioner allowed petitioners a basis of $2,500, the total cost of the two tracts of land, even though, as noted above, part of the land had been sold in a prior year. Petitioners have introduced no evidence indicating that they had made capital improvements to the property sold or otherwise acquired basis in the property in any amount greater than respondent has allowed. Accordingly, we sustain respondent's determination that petitioner realized a long-term capital gain of $17,500 on the sale of the New Hampshire property. Issue 8. Fraud
As discussed above, petitioners did not report the sale of a beer wagon which they made in 1973 in their joint Federal income tax return for that year. Petitioners similarly failed to report the sales, also discussed above, of New Hampshire real estate and of various antiques in their joint Federal income tax return for 1974. Petitioner explained that his failure to report the sale of the beer wagon and of the antiques was due to his belief that his bases in those items, considering the amounts that he had spent having them restored as well as their original purchase prices, were at least equal *238 to the proceeds of the sales. In resolving the question of petitioner's income tax liability above, we have held that this was not the case but that, on the contrary petitioner realized substantial gains on the sales. Our holding on that issue, of course, does not resolve the question of petitioner's sincerity in claiming that he realized no gain on the sales. Petitioner explained that his failure to report the sale of the New Hampshire real estate was due to his belief, based on the advice of friends, that the gain was not taxable if the proceeds of the sale were reinvested. Petitioner stated that, although he realized that "you couldn't go out and buy groceries" with the proceeds of the sale, and still qualify for nonrecognition, he believed that the use of the proceeds for "capital investment * * * something of value that would make you money or appreciate" would qualify. Petitioner stated that he used the proceeds of the sale of the New Hampshire land to pay off the mortgage on other property which he owned and to make improvements to the house and barn of his Ohio farm. Here, also, our holding above that petitioner realized and must recognize a substantial gain on the sale *239 does not resolve the additional question of petitioner's intent in omitting to report the sale. The purchaser of the beer wagon was a Canadian brewery, but petitioner did not know at the time he made the sale that the individual with whom he negotiated was buying the wagon for the brewery rather than for himself. When, in 1976, during the audit of his returns, petitioner was asked by one of respondent's agents whether he had sold a beer wagon to a Canadian brewery, petitioner initially responded that that was merely an allegation. When the agent persisted, petitioner denied that he had made the sale. Petitioner now claims that his denial was based on his belief at the time the question was asked that the person to whom he sold the wagon was buying it for himself rather than for a Canadian brewery. Petitioner did not then volunteer the information that he had sold a beer wagon, although not, as far as he knew, to a brewery.Petitioner later admitted to the agent that he had, in fact, sold the beer wagon for $8,000, but professed he had forgotten where, when, from whom, or for how much he had bought the wagon. The agent also questioned petitioner on the sale of the New Hampshire *240 real estate. Petitioner initially responded that the sale had occurred four or five years prior to the interview, that is, in 1971 or 1972, and that any gain realized had been reported in his tax return for that year.In a later interview, the agent confronted petitioner with the fact that the real estate was sold in 1974, and not several years earlier, as petitioner had claimed. At this time petitioner claimed that the sale had not been reported because he had believed that it was not taxable due to his reinvestment of the proceeds. The agent also questioned petitioner on the auction of the various antiques. Petitioner responded that he remembered none of the details concerning the auction and that he was unable to furnish any information concerning his basis in the items sold or when or from whom they were acquired. The Commissioner determined that petitioners' failure to report the sales of the beer wagon, the antiques, and the New Hampshire real estate was due to fraud on the part of the petitioner Norman D. Stuckey. Accordingly, the Commissioner imposed additions to tax for the taxable years 1973 and 1974 under section 6653(b). The Commissioner concedes that the petitioner *241 Frances A. Stuckey is innocent of fraud. Section 6653(b) provides that, if any part of any underpayment is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. Fraud, within the meaning of section 6653(b), is an intentional wrongdoing with the specific intent of evading a tax believed to be owed. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). Whether fraud exists with respect to an underpayment of tax is a question of fact, and the burden is on respondent to show the existence of such fraud by clear and convincing evidence. Sec. 7454(a); Stone v. Commissioner,56 T.C. 213, 220 (1971); Rule 142(b). The answer to this question must be determined by an examination of the entire record. Stratton v. Commissioner,54 T.C. 255, 284 (1970). The required intent may be shown by circumstantial evidence and reasonable inferences drawn from the facts. Stone v. Commissioner,sura at 224; Gajewski v. Commissioner,67 T.C. 181, 200 (1976). *242 Our holdings on the issues discussed above make it clear that petitioners did, in fact, underpay their taxes for each of the years for which respondent has imposed an addition to tax under section 6653(b). On the record before us, we find that respondent has carried his burden of proving that part of each underpayment for the taxable years 1973 and 1974 was due to fraud on the part of the petitioner Norman D. Stuckey. We find petitioner's explanation of his failure to report sales which yielded gross proceeds of over $45,000 to be unconvincing. The omission of such large amounts over a number of years is, itself, an indication of fraudulent intent to evade taxes. Otsuki v. Commissioner,53 T.C. 96, 108 (1969); Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957). Petitioner's failure to maintain adequate records is another indication of fraud. Spies v. United States,317 U.S. 492 (1943). A further indication of such intent is petitioner's evasiveness when interviewed with regard to the sales in question by respondent's *243 agent. Gajewski,supra at 200. [11] Petitioner's profession of ignorance with regard to the amounts he had paid for the beer wagon and the antiques directly contradicts the position he claims to have taken in omitting to report the sales of these items, that is, that he was only getting back the money that he had spent for them. We also find it incredible that a collector would have practically no recollection of the time, place, or price of acquisition of any of the items in his collection. We also note that, with regard to the sale of the New Hampshire real estate, petitioner's argument is essentially, that he mistakenly believed that section 1034, concerning the rollover of gain on the sale of a taxpayer's principal residence applied to the transaction. Petitioner did not, however, report the sale and reinvestment of the proceeds, which he allegedly believed to qualify the sale for nonrecognition of gain, as is customary for sales qualifying under section 1034.[12] Instead, he omitted any mention whatever of the transaction.After considering these factors, our own appraisal of petitioner's credibility, and the record as a whole, we are convinced that petitioner's failure *244 to report the transactions in question was not the result of mere ignorance or a mistaken construction of the law, but rather of an attempt fraudulently to evade the income tax. Respondent's imposition of additions to tax under section 6653(b) is, therefore sustained. Issue 9. Due Process of Law
At trial, petitioner expressed his belief that respondent's files contained a memorandum, written by one of respondent's agents, which either stated or implied that petitioner had attempted to bribe the agent. This belief was based on an inference drawn by petitioner from an informal statement made by respondent. Respondent has not accused petitioner on the record of attempted bribery, however, and, in fact, the agent who supposedly wrote the memorandum containing the accusation testified, in answer to petitioner's question, that he never believed that petitioner was offering him a bribe. Petitioner sought to obtain access to respondent's files in these cases in order to look for the memorandum supposedly containing the charge *245 of attempted bribery. Petitioner believed that this memorandum, if it existed, could be used to impeach the testimony of respondent's revenue agents on other matters. Petitioner argued, It goes to the question of credibility of the agents. It all goes to the question of demonstrating an element of misunderstanding in their dealings with Mr. Stuckey. And if they misunderstood in one area, all that I'm trying to demonstrate is that they could have misunderstood in a couple of other areas as well. Although we denied petitioner the general access to respondent's files which he requested, we inspected the files in camera and concluded that they contained no allegation of attempted bribery. We stated this conclusion for the record in these cases. Petitioner now argues that our rejection of his request to inspect respondent's files himself denied him the due process of law to which he is entitled under the Fifth Amendment of the Constitution. The argument is stated in petitioner's brief as follows: "Denial of Due Process * * * It is respectfully submitted that the failure of the Court to give the Petitioners' counsel an opportunity to participate in this exercise by inspecting *246 the documents personally was error. It deprived counsel who may frequently be in a better position than the Court, being much more familiar with the entire case than the Court, to sport the inconsistencies and nuances in the documents which could conceivably have been used to intelligently argue and attack the credibility of Respondent's witnesses.
Petitioner cites no provision of the Tax Court Rules of Practice and Procedure which would grant him the right to search respondent's files, but instead bases his argument entirely on Constitutional grounds. An extensive discussion of the Rules is, therefore, unnecessary. We note, however, that petitioner has not complied with Rule 70(a)(2), which requires discovery to be completed, unless authorized by the Court, no later than 45 days prior to the date set for call of the case from a trial calendar. We also note that Rule 70(b) limits the scope of discovery to matters which are relevant to the subject matter involved in the pending case; petitioner did not attempt to limit his request to relevant matters, but instead asked to examine the memoranda *247 in respondent's files generally in search of one allegedly relevant memorandum. It is, therefore, clear that we were not required by the Rules to grant petitioner's request. Turning to petitioner's Constitutional argument, we believe that petitioner's rights and interests in this matter were protected by our own careful examination of respondent's files. As indicated above, that examination disclosed no document of the sort that petitioner indicated he wished to discover. Accordingly, we conclude that our refusal to allow petitioner personally to inspect respondent's files in search of "inconsistencies and nuances" did not deny him due process of law. Decisions will be entered under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. References to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
2. As used here, the phrase "gross income" means gross income as defined in sec. 61, modified as provided for in sec. 6501(e)(1)(A)(i)↩.
3. Cf. Robertson v. Commissioner,T.C. Memo. 1973-205↩.
4. As discussed below, there were also other omissions of income from petitioners' Federal income tax returns for 1973 and 1974. It is, however, unnecessary to consider these other omissions in order to resolve the question of the timeliness of the mailing of the notice of deficiency for those years. Neither does the resolution of that question require us to consider respondent's argument that petitioners' returns for 1973 and 1974 were fraudulent, and that, consequently, the tax for those years may be assessed at any time under the provisions of sec. 6501(c)(1)↩.
5. We note that the automobile trips in question constituted local travel. Consequently, the expenses of those trips are not subject to the strict substantiation requirements of sec. 274(d). Barry v. Commissioner,T.C. Memo. 1978-250; Sec. 1.274-5(a)(1), Income Tax Regs.; Rev. Proc. 80-7, 1980-1 C.B. 590, 591, modified by Rev. Proc. 80-32, 1980-2 C.B. 767↩.
6. Respondent concedes that the Iowa farm was an activity engaged in for profit.↩
7. In the returns, the cash expenditures were broken down into various categories of expense--labor, feed, fertilizer, and so on.↩
8. The deductions for taxes and interest were claimed by petitioner as itemized deductions on schedule A of his Federal income tax returns rather than on his schedule of farm expenses, and they are not included in the expenses discussed in issue (3) above.↩
9. Respondent now concedes, however, that petitioner is entitled to an additional deduction for 1973 in the amount of $239.72 for real estate taxes on his Iowa↩ farm.
10. The record does not reveal when the wagon was purchased.↩
11. See also Sherman v. Commissioner,T.C. Memo. 1977-261↩. 12. Sec. 1.1034-1(i)(1), Income Tax Regs.↩